The Honorable, the United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honorable Court may give their attendance and they shall be heard. God save the United States of America and this Honorable Court. Court is in session. Today's cases will be called as previously announced and the times will be as allotted to counsel. The next case to be heard today is Akebia Therapeutics, Inc. v. Alex Michael Azar II at all, appeal number 20-1161. Good morning, counsel. So if Attorney Dickey has her audio muted, that would be great. And Attorney Waxman, we want to make sure you're unmuted and when you are ready, you may proceed with a couple-minute opening statement and then we'll have questions for you. Thank you. Thank you. Am I unmuted? You are good. Go ahead. Hello? Yes, I can hear you fine. Okay, great. Thank you. Good morning, Your Honors, and may it please the Court. My name is Seth Waxman, appearing for the appellant, Akebia Therapeutics. With the Court's indulgence, I'd respectfully request two minutes reserved for rebuttal. Okay. Counsel, instead of giving you rebuttal time, if you, if something comes up during the appellee's argument that you have not already adequately covered in your briefs or had a chance to cover in your principal presentation, you may file a written reply brief without further leave of court by midnight tonight, Eastern Time, and that will be in lieu of rebuttal time this morning. I understand, Your Honor, and thank you. Akebia, the only oral drug ever approved by the FDA to treat iron deficiency anemia in individuals with chronic kidney disease, was improperly excluded by CMS from Medicare Part D, and as a result, Akebia is losing millions of dollars that can never be recovered, and critically ill patients have lost coverage for this unique drug. Correctly, the government doesn't invoke deference for its shifting interpretation of the mineral product's exclusion. In the district court, CMS said it looked to whether a drug's active ingredient is a mineral, a sensible interpretation that does not exclude arixia, whose active ingredient is a novel organic compound. On appeal, the government doesn't even acknowledge what it told the district court, now contending implausibly that a mineral product is any product that contains any mineral in any amount. The government tries to cabin this overbroad interpretation by imposing a use limitation that is not merely atextual but antitextual. In any event, that interpretation also would not exclude arixia because IDA in patients with CKD is not the same thing as iron deficiency, as the record in this case shows. CMS independently violated the APA through its arbitrary decision-making. Even now, the government is unable to reconcile its erratic treatment of different drug products. As just one example, CMS covers electrolytes even though it concedes they are minerals and that they are used to treat a mineral deficiency. The government's procedural arguments, unendorsed by the district court, are wrong. The decision is plainly final agency action, and its jurisdiction-challenging objection fails both because Akebia is not suing on behalf of anyone who could seek and administer review, and also because Akebia's claim is not the same as any claim that any such person could bring. Accordingly, denial of the preliminary injunction should be reversed. Thank you, Mr. Waxman. This is Judge Howard, and I have a two-part question involving the likelihood of success on the merits. So, I am looking at the principle of Pelley's brief at pages 28 and 29, and I'm taking them slightly out of context just for the sake of saving time, but there are assertions made on 28 and 29, and so I quote, on 28, the government says, in Arixia's case, Akebia takes the mineral acid, and on 29, the government says, but behind all the chemistry is a simple fact, colon, Akebia applies a manufacturing process to a mineral, iron, to make a mineral product, Arixia, with the active ingredient ferric citrate coordination complex. So my first question is, are these assertions accurate? And second, if they are accurate, can you still win without relying on whatever assistance the addition of the citric acid derivative provides to your argument? I'm not sure that I understood the second part of your question, Judge Howard. So, if the government is correct in its assertion that the product here contains a mineral without getting into other properties of the product, if the government is correct in that assertion, can you still win? Oh, yes, okay, yes. There is no doubt that one of the components of this chemically synthesized organic compound is a mineral, that it is a synthetic form of iron, but we can still win because the definition of a mineral product cannot be any FDA-prescribed drug that includes a mineral in any quantities and for any indications. I mean, that would exclude, I don't know if it would be most, but it would exclude thousands of pharmaceutical drugs that nobody would sensibly contend are minerals and that are included under Part D. The definition of what a mineral product is, which, by the way, CMS, outside of this litigation, has never, ever articulated to our knowledge, is, as it told the district court, that it is a substance that, a, quote, any manufactured substance that contains a mineral as an active ingredient. We think that's an appropriate definition, if not the definition they urge in this court, which is also an indication of arbitrary and capricious decision making, but accepting that as a definition of what a mineral product is, the record is utterly clear that it does not cover this because the active ingredient in oryxia is not a naturally occurring inorganic substance. It is a chemically synthesized organic compound, and therefore, yes, we would have to win. I hope that answers your question. Thank you so much. Just before I turn it over to Judge Selya, if I didn't say this already, if you do find that you need to file a rebuttal, please limit it to three pages. Thank you. Judge Selya. I will. Thank you. Judge Selya. Mr. Waxman, the significance to me of the language in the statute is that we're dealing here with the term mineral product, not mineral, and I struggle with the notion that a mineral we somehow have to read the language mineral product necessarily to mean that the mineral must be the active ingredient or an active ingredient in the product. You help me on that? Yes. I think in the first instance, Judge Selya, I don't want to avoid this question at all, but I think you could reverse clearly because the CMS's decision here is clearly arbitrary and capricious, both because in applying its use limitation, which we think is contrary to the statute. I understand you have other arguments, and sure, the process being what it is, we could probably reverse because if I could see you, I might not like the color of your necktie, but I'd really prefer it if you answered the question I asked you. Yes. What is the rationale for reading that language, mineral product, which does not seem to me to be of any direct relationship to the mineral being the active ingredient in the product rather narrow and specific way that you'd like us to read it? Well, number one, we think it is a, this court is in a position, since no deference is sought for or due to the CMS's determination, we think it is actually the best sensible reading of the language because... That's what I'm getting at because it strikes me as somewhat artificial, and to explain to me why it's the most sensible reading. Because there are hundreds of thousands, I mean, there are a vast number of prescription drugs that nobody would ever think are not covered under Part D that contain a mineral as one of the substances. Lipitor is an example we gave in our brief, but, you know, which Congress can't possibly have thought to exclude every prescription pharmaceutical that includes a mineral as one of its components. And so the question is, what did Congress have in mind? What is the best understanding of what it has in mind? There are two, the government offered below two different suggestions. One was that it was a, quote, manufactured substance that contains a mineral as an active ingredient. That is a much more limited subset, and it makes sense because when the mineral is an active ingredient, it is by definition acting to supply, to treat a mineral deficiency of some sort. That's true with respect to iron supplements. It's true with respect to non-prescription iron supplements like ferrous sulfate. It is not true with respect to Erixia, which treats not an absolute deficiency of iron, but the chronic kidney disease patient's inability to use iron to create hemoglobin, that is to absorb the iron and utilize it in erythropoiesis. So my short answer to your question, I apologize for the stem winder, is that the presence of a mineral in a compound that is prescribed by, that is authorized by FDA to be a prescription medication cannot possibly be the test because it would exclude a vast number of drugs that no one contends are covered. But I don't understand the secretary to be contending that that is the test, and my question was really the obverse of that, because what I'm trying to get at is, whereas I understand that the presence of a mineral may be so insignificant in a particular product when one considers its formulation and its use that it may not be within the statutory purview, my question was really on the other end of the spectrum, why should active ingredient be the test? I'm struggling with the notion of reading that into the language because it doesn't seem unreasonable on its face for the secretary to apply the term mineral product as it's used in this statute to a product such as this which not only creates, not only contains a mineral, but is used for the treatment of an iron deficiency anemia. So again, no one has suggested, and of course this may be a case, this may be an instance that would have cried out for the expert agency to have given some explanation for what it ever did, including in the communication that denied our request that the orexia for IDA be included. And in the federal courts in this case, it is offered two different definitions. Now in both cases, and I hope this is responsive to your question, the government tries to use a mineral as either its active ingredient or some ingredient, but it also has to be used to supply, to correct a mineral deficiency in the body. Now I have three quick points I want to make about that. Number one, that is, for the reasons I've just stated, that is a post hoc litigation rationale unsupported by any document ever made in the United States submitted by the agency or promulgated by the agency. Number two, it is arbitrary and capricious because it doesn't account for either of the following two things. Number one, as I said, the treatment of iron deficiency anemia in CKD patients is not the supply, is not to remedy the fact that a patient is not ingesting or not able to store enough iron. As the declarations of Dr. Chertow, the articles that we've submitted in the record and the brief for the Center for Medicare Advocacy on pages 11 through 15 explain, iron not to ingest enough iron, it's the inability to absorb or utilize it. Here's a good analogy. My car stops running. I have a full tank of gas or a half a tank of gas or three quarters of a tank of gas, but there is a blockage in the fuel line. A compound that is introduced into the car to remove the blockage from the fuel line is not properly categorized as supplying a gasoline deficiency and that's exactly what occurs here. Third, the government has no explanation even under this use definition for how it is covering a whole category of organic mineral salts that are used to treat a mineral deficiency or its coverage of vitamin D analogs, which the government says, and I quote, are chemically synthesized compounds that are often prescribed to CKD patients to treat conditions arising from vitamin deficiencies. Thank you. That's helpful, Mr. Waxman. Thank you, Mr. Waxman. Judge Thompson? Yeah, I just have a couple more simple questions. I'm curious, we filed a, the government filed a 28-J involving the administrative decision. Did Akiva have any participation in that hearing? The answer is no, and there is no avenue for manufacturers like Akiva to participate at all in the agency's administrative hearing process. Okay. And also, CMS issued its decision in September of 2018 to sponsors to look at the record and let them know that they would no longer cover Arixia. I'm just curious, because my assumption is that Akiva did its due diligence, why you nonetheless proceeded and bought Carex? So what the record reflects is a couple of things, Judge Thompson. Number one, the, this was a merger- I'm sorry. I'm sorry. I'm sorry. I'm thinking about trying to think through how you suffered irreparable harm knowing that this decision was in place and going forward anyway. So, number one, the transaction in question was a merger of two companies, Akiva and Carex. And the company that filed the lawsuit, that Carex, which was the original company, is very much a component of, and the same, essentially the same plaintiff as Akiva. Number two, the transaction, the contract for the merger was set and agreed upon and obligated each party before the CMS rendered this decision. The government put to the fact that there was one change in the agreement after CMS's decision to exclude Arixia, but that was just a formulaic change in the number of direct that would serve on the board of directors. And in any event, with respect, there is no case law to support the fact that even if this transaction had post-dated the determination, if it was an acquisition of the patents and the assets rather than a merger of two companies, that that would defeat a claim of irreparable injury. There's just no case law whatsoever to support the notion that a company could not buy an asset that was already impaired and claim nonetheless that it was being irreparably injured as we are here. The government agrees, doesn't dispute certainly, that we're losing millions of dollars and we have no basis whatsoever on which we can recover because the government is protected by sovereign immunity. I hope that answers your question. Thank you. Yes. Thank you. I don't have any additional questions. Thank you, Judge Thompson. Mr. Waxman, if you would just mute your audio and Attorney Dickey, if you would unmute your audio. And Ms. Dickey, why don't you take a couple of minutes and give us an opening statement. Thank you, Your Honor. May it please the court, Jennifer Dickey for the appellees. This court should affirm the denial of a preliminary injunction. Under a well-established line of cases, the claim that Erixia is a covered Medicare Part D drug must be channeled through the agency. That claim arises under the Medicare statute and can and in fact is being pursued by beneficiaries through the claim reimbursement process. Although Akebia cannot itself file a claim for reimbursement with the agency, decisions from the Supreme Court, the Fifth Circuit, and the D.C. Circuit all establish that the jurisdiction channeling requirement focuses on the claim, not the claimant. And Congress has required this claim to be channeled through the agency. Even if that were not the case, this suit would still be meritless because the CMS email does not constitute final agency action subject to review under the APA. The legal consequences to which Akebia points are all legal consequences that flow from a coverage determination, which this email was not. Coverage determinations are made in the first instance by planned sponsors and are subject to the administrative review process I just mentioned. And even setting aside those fundamental problems, the district court correctly held that when used as an iron replacement product for the treatment of iron deficiency anemia, Erixia is a mineral product excluded from coverage under Medicare Part D. The statute excludes prescription vitamins and mineral products. When it is prescribed for iron deficiency anemia, Erixia falls within this exclusion. It is made from an iron salt and it delivers iron to correct an iron deficiency. The district court accordingly did not abuse discretion in denying the preliminary injunction, particularly where Akebia had also failed to establish irreparable injury. Mr. Dickey, on your last point about the merits of the case, can you just give me what you consider a citation or a name to what you consider to be the closest analog to this case, either a federal court case or an administrative case? On the merits question. On vitamins and mineral products exclusion? Yes. I'm not aware of any court that has interpreted the vitamins and mineral products exclusion. All right. And an administrative decision? If I wanted to look to a case to sort of figure out how to decide this case, what is the closest analog that you can give me? Or a decision by CMS? I mean, the closest would be Medicare Appeals Council decisions interpreting this exclusion, some of which are found on Westlaw and on their website, but this exclusion has not otherwise been interpreted. All right. Thank you. Judge Salia? Yes. Ms. Dickey, you haven't responded to Mr. Waxman's principal argument or one of his principal arguments, which centers on the fact that in his view, this drug doesn't itself supply the iron deficiency, but merely facilitates a body itself remedying the iron deficiency. Do you find that distinction to be tenable? And if not, why not? No, we do not. If you look to the descriptions from the FDA in the record about this product, the FDA has determined that it is an iron replacement product, and the explanation for why it can treat a functional iron deficiency is that the iron that is being supplied is a more absorbable form of iron. The iron that is being supplied by the body to the enzymes in the gastrointestinal tract is reduced to a more absorbable form of iron that, therefore, can be used by the body, but it's still delivering iron and curing an iron, or treating an iron deficiency. And so that plainly falls within our understanding of the use component of the test for this exclusion. Okay. Just one or two more questions. Do you agree that on this record, and given the positions taken by the parties, that we have to decide the merits of this case without any deference to the agency's interpretation? The agency has not claimed any deference for this guidance. That's correct. So that's kind of a long-winded way of saying that we can decide it without deferring. That's correct. Okay. All right. And let me use the remainder of my time to just ask you about your procedural defense. It seems to me that your position boils down to the fact that this ruling is not a final agency ruling or final agency decision, but there is no way that a TVer itself can obtain a final agency ruling or even be a party to a proceeding that results in a final agency ruling if we accept your view of the administrative structure. Have I got that right? That's essentially correct. Although the final agency action argument is slightly separate from the jurisdiction channeling argument. But we do think that even though a TVer cannot be a party to the beneficiary claim reimbursement process, that is still the administrative process through which its claim would need to be adjudicated. There are very few areas of law in this country where a party's substantial rights and a TVer certainly has substantial rights in this drug can be conclusively determined without it being able to be heard in a particular proceeding. And I get very uncomfortable, and I think I can understand why the district court chose instead to go to the merits rather than deal, if that's the government's procedural argument, rather than deal with this jurisdictional channeling argument. Are you aware of any other area in the law where substantial rights can be affected or taken away from a party without the party being given an opportunity to be heard? Yes, certainly in any zone of interest type case, even if a party has substantial rights. If those rights are not the sort that were being protected by the statute at issue, they are not permitted to bring a claim. But boy, it's hard to say that the manufacturer of a prescription drug isn't within the zone of interest as far as the ability of doctors to prescribe that drug. Third party intermediaries determine the profitability of prescription drugs in the marketplace. That's just a common sense proposition. And as I say, I get uncomfortable with the notion that drug companies, whatever else one may say about them, should be treated as some kind of third class citizens when it comes to protecting their proprietary interests. I can certainly understand that discomfort, Your Honor, but I would simply note that this is a decision that's been made by Congress. Congress decided to create a beneficiary claim reimbursement system. And while certainly drug manufacturers have an interest in Medicare, Medicare is fundamentally about those beneficiaries. And Congress made a determination that channeling even the beneficiary's claims through the agency protected their rights and was appropriate. And in Illinois Council, the Supreme Court recognized that this process could result in delay, but that it was still the process that Congress had enacted. And it would be sort of unusual to think that Congress had created this, you know, this reticulated review scheme for beneficiaries, but allowed drug manufacturers to proceed directly to court. And I think if you look at the case law interpreting the jurisdiction channeling provision at issue, I would point it particularly to Illinois Council itself and to the National Athletic Trainers Association case out of the Fifth Circuit and the American Chiropractic Association case out of the D.C. Circuit. All of those cases involved plaintiffs who were not themselves able to be a party to the administrative scheme, and yet their claims were still held to be channeled and not subject to judicial review in the first instance. And that is the case here. In the National Athletic Trainers Association case, athletic trainers wanted to challenge a regulation that provided that physical therapy services that they were administering, incident to physician services, were no longer reimbursable under Part B. Obviously, they had substantial rights and reimbursement for their services, and yet the Fifth Circuit explained that that claim was channeled because physicians had administrative remedies available to them and sufficient incentive to challenge the rule. The same is true here. Beneficiaries have administrative remedies available to them and sufficient incentive to challenge the rule, and it's also possible that a KBF could get involved in the process by having an individual who works for the company try to act, be appointed as a representative for a beneficiary. There is a representative process now. It has to be an individual, and that's subject to beneficiary domination of the process as well for the drug manufacturer to have some of its arguments heard. But fundamentally, Medicare is about the beneficiaries, and this claim is about coverage determination for beneficiaries. I find it a little odd to think of a beneficiary who has a very limited interest in a particular prescription for a particular illness as being a surrogate for a manufacturer that has millions of dollars on the line, but I notice my time has gone, and I thank you for making sure that on this subject I'm better informed, if not more comfortable. Thank you. Judge Thompson? Hello? Hello? Hello? Yes. Yes. Yes. Okay. I don't know what happened. Sorry. I said, in addition to this representative process that you just described, is there any other mechanism for a KBF to intervene in a proceeding, a drug-related process that is a challenge proceeding brought by either a prescriber or a recipient?  A beneficiary? No, there's not. And the Fifth Circuit recognized in the, I think, both the National Athletic Trainers Association case and the Southwest Pharmacy Solutions case that that was not dispositive for the application of the jurisdiction channeling requirement. Okay. I don't have any additional questions, and to the extent that I have additional time, I can give it back to Judge Selya or Judge Howard. Thank you, Judge Thompson. Ms. Dickey, just one follow-up. I understand the jurisdiction channeling issue and the questions that Judge Selya was asking, and I have to say I share his discomfort, but I know it's this sort of stocking horse approach has been going on for a while. How long has it been ensconced in the process? Well, how long has, I'm afraid I don't understand the question. How long has Erixia been, have Erixia beneficiaries been pursuing their rights? No, no. The, how long has this process been in place that manufacturers are not considered to have a sufficient stake or, well, let me rephrase that, can't participate since the inception, I take it? Yes, since the inception of the statute. I mean, Illinois Council was from 2000, but decisions interpreting the jurisdiction channeling which originated in the Social Security Act go back well into the 70s. And I think the fact that you don't see a lot of manufacturers bringing these claims sort of underscores that the claims are intended to be channeled through the agency. Why don't you take a minute to wrap up? I would just thank the judges for their time. We do believe that the claims should be channeled, but because this is the denial of a preliminary injunction, we also think that that denial can be affirmed on either of the merits to action, the final agency action argument, or for the lack of irreparable harm that the district court did not abuse its discretion in concluding that Zakibia had failed to meet its burden. And we respectfully ask that you do affirm that denial. Thank you.  And the clerk may now take us to recess. This session of the Honorable United States Court of Appeals is now recessed until the next session of the court. God save the United States of America and this honorable court. Counsel, you may disconnect from the meeting.